## 42602. PERRY v. THE STATE.
### (339 SE2d 922)

GREGORY, Justice.

Charles Perry, Jr. was convicted of the murder of his grandmother and sentenced to life imprisonment.[1] We affirm.

Perry had been reared by his grandmother. However, evidence at trial revealed a stormy relationship between them in Perry's adult life. Witnesses testified of conversations with Mrs. Perry in which she revealed instances of Perry beating her, particularly when he needed money. Perry's ex-wife, Susy, also testified that she had seen Perry

---

[1] Perry was arrested on January 22, 1982, and indicted on April 12, 1982. The jury verdict was reached and sentence was pronounced on May 2, 1984. A motion for new trial was filed on May 2, 1984 and denied on April 9, 1985. Notice of Appeal was filed on April 24, 1985. The record was docketed on August 12, 1985. The case was submitted on September 27, 1985.

shove his grandmother into a door and harass her in other ways. One witness testified to seeing the pair argue and of Perry throwing a brick through a window which hit his grandmother in the face.

At around 5 p.m. on January 22, 1982, the grandmother's downstairs neighbors heard loud noises coming from her apartment as if items were being thrown. At around 5:10 p.m., Perry's ex-wife received a phone call from Perry, who said "mama's dead." The ex-wife then called the downstairs neighbors and asked them to check on the grandmother. The neighbors could not get into the apartment and received no replies to their calls. The police were summoned and arrived around 5:24 p.m. They found Perry at the top of the stairs. Inside Mrs. Perry's residence, police found the door to her bedroom locked. Perry kicked in the door. The grandmother was lying on the floor in a pool of blood. The entire bedroom was splattered with blood. Perry denied killing his grandmother and became disorderly. The police gave Perry the *Miranda* warnings and took him to the Savannah Police Department station. In examining the grandmother's home, police found a set of Perry's clothes covered with blood stains. Police also confiscated a lamp, which was believed to be the murder weapon. Mrs. Perry apparently died as a result of a severe blow to the head with a blunt instrument.

Perry was tried by jury for murder on May 2, 1984, and convicted.

1. Perry first contends he was denied a speedy trial in violation of his Sixth Amendment rights. Perry was arrested on January 22, 1982 and not tried until May 2, 1984, due to a series of delays and continuances prompted by both prosecution and defense attorneys. In the meantime, Perry filed a petition for a writ of habeas corpus. In *Perry v. Mitchell*, 253 Ga. 593 (322 SE2d 273) (1984), this court refused to overturn the denial of Perry's habeas petition and held he had not been deprived of his right to a speedy trial. Perry in the instant appeal argues from the same facts and raises the same issues dealt with in his earlier appeal, and thus we need not review the contention for a second time.

2. Perry also contends the trial court erred in allowing into evidence statements he made while in police custody after expressly refusing to sign a waiver or be questioned in the absence of an attorney.

Perry was arrested at his grandmother's house soon after police found the severely beaten body of his grandmother. He was advised of his *Miranda* rights at the time of arrest, and then transferred to the Savannah Police Department station. Upon arrival at the station, Perry was again advised of his rights. Perry refused to sign a waiver and said he did not want to answer any questions. He was then held in an interrogation room awaiting transport to jail. While Perry was waiting, Detective Thomas of the Savannah Police Department ar-

rived. Thomas had been investigating the scene of the killing. The detective walked into the interrogation room carrying a lamp believed to be the murder weapon. Upon seeing the lamp, and not in response to police questioning, Perry told the detectives he had put the lamp into a closet because the bulb was burned out. Also, Detective Thomas noticed what he believed to be blood on Perry's shoes. Thomas asked Perry to let him see the shoes. Perry immediately responded that the stains on his shoes were ketchup, and not blood.

*Miranda* safeguards were designed to protect suspects from coercive custodial interrogation. The protection now extends beyond express questioning to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U. S. 291, 301 (100 SC 1682, 64 LE2d 297) (1980). But, the *Innis* court added, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id. at 301-02.

Before the trial court could admit the statements into evidence, the prosecution was required to show by a preponderance of the evidence that they were voluntarily made. *Lego v. Twomey*, 404 U. S. 477, 489 (92 SC 619, 30 LE2d 618) (1972); *High v. State*, 233 Ga. 153, 154 (210 SE2d 673) (1974). Here the trial court found the statements were voluntarily made. This finding must be accepted by an appellate court unless it is clearly erroneous. *High*, supra at 154. We hold the finding of voluntariness in this case is not clearly erroneous.

3. On the weekend before the trial, the prosecution sent two hair samples to the State Crime Laboratory for testing. One sample was taken from the victim's head and the other from the lamp believed to be the murder weapon. The tests revealed blood type A on each sample. Both Perry and the victim have blood type A. The prosecution did not receive the test results until after the first day of the trial. The next morning, the prosecution called the expert who conducted the tests to testify as to the results. Perry objected and moved for exclusion. The trial court instead allowed Perry's counsel a 15-minute recess to interview the witness and prepare for cross-examination.

Perry now contends the evidence should have been excluded because copies of scientific reports should be submitted to defendants at least 10 days before trial, apparently alluding to the requirements of OCGA § 17-2-211. However, § 17-2-211 applies to scientific reports in writing and not oral reports of experts relaying the results of tests. *Faircloth v. State*, 253 Ga. 67 (2) (316 SE2d 457) (1984); *Law v. State*, 251 Ga. 525 (2) (307 SE2d 904) (1983). Cf. *State v. Madigan*,

249 Ga. 571 (1) (292 SE2d 406) (1982). Whether oral scientific reports should be reduced to writing and submitted to the defendant is a question for the legislature.

4. Perry claims the trial court erred in allowing hearsay evidence of certain prior acts of violence involving Perry and his grandmother. Several witnesses testified of conversations with the grandmother during which she related specific instances when Perry had beaten her, particularly when he needed money. The statements were not offered to show that Perry had in fact beaten his grandmother, the truth of the matter asserted therein, but rather to demonstrate a relationship of ill will and animosity, and thus the motive for the killing. OCGA § 24-3-2.

5. Perry finally contends the trial court erred by recalling an alternate juror to replace a disqualified juror after the jury had retired to deliberate and the alternate had gone home.

The record indicates the jury retired to deliberate and the alternate jurors withdrew from the courtroom immediately after the jury charge. As the jury was selecting a foreman, it was discovered one of the jurors had served on the grand jury that indicted Perry. Once alerted, the trial court ordered the sheriff to contact the first alternate as soon as possible. The other jurors were permitted to go home for the evening and instructed not to discuss the case with anyone or read or view reports about it. The alternate juror was reached, according to her testimony, as soon as she arrived home from the courthouse. The next morning she was questioned by the court and said she had not discussed the case or read or heard anything about it overnight. The court then sent the original eleven jurors and the alternate out to deliberate.

OCGA § 15-12-172 provides that the alternate juror may take the place of a juror who becomes ill or for other good or legal cause is shown to be incapacitated. In making the substitution, the trial court must necessarily use its discretion. *Green v. State*, 246 Ga. 598 (16) (272 SE2d 475) (1980). Furthermore, substitutions under § 15-12-172 are proper even after deliberations have begun. *Tanner v. State*, 242 Ga. 437 (1) (249 SE2d 238) (1978). In this case, the trial court acted well within its discretion in substituting the alternate. The court made every effort to contact the juror as soon as possible and ascertained that she had not been contaminated by outside information or influence. The court's action was in accord with the purpose of the statute in question, which seeks to promote the important state interest of judicial efficiency by avoiding unnecessary retrials when a juror is unable to continue. *Tanner* at 438.

Perry also argues the court acted improperly because § 15-12-172 states no substitution can be made after an alternate is discharged. However, we hold that the purpose of the statute is to provide a pro-

cedure for the use of alternate jurors. While the statute uses the term "discharged," we do not believe the intention of the legislature was to thereby preclude the use of discharged alternate jurors as long as nothing has happened to affect the alternate's qualifications to serve.

6. We have reviewed all the evidence in light of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), and find in the light most favorable to the jury's verdict that a rational trier of fact could have found Perry guilty beyond a reasonable doubt.

*Judgment affirmed. All the Justices concur, except Smith and Weltner, JJ., who dissent.*

SMITH, Justice, dissenting.

1. "It is an insult to intelligent people to say that a scientific test was conducted from which absolutely no notes or records survive. Unless of course the omission was deliberate. . . . The majority opinion condones the performance and use of haphazard, hasty, inaccurate, unreliable and undocumented tests by the state where a man's liberty is at stake." *Law v. State*, 251 Ga. 525, 530 (307 SE2d 904) (1983) (Smith, J., dissenting).

"[T]he reasoning of the majority [in *Law*, supra] might in some other case result in an intentional frustration of the plain purpose of OCGA § 17-7-211 (Code Ann. § 27-1303). If the result of a scientific procedure must be reduced to writing in order to be subject to discovery, then the statute may be ignored with impunity, by the failure of the examiner to prepare a report." *Law*, supra at 531. (Weltner, J., dissenting).

It is disturbing to contemplate that our dissents in *Law* may have served as primers for prosecutors in methods by which they might circumvent the requirements of OCGA § 17-7-211, and frustrate the fact-finding process and the intent of the legislature.

Two years, three months, and four days elapsed between the date of the crime in this case and the date that the hair and blood sample was sent to the crime lab. Two years and four days elapsed between the date of the indictment and the date that the sample was sent to the crime lab. The prosecution offered no excuse for the delay.

This delay either constitutes "an intentional frustration" of the defendant's right to examine scientific evidence which will be used against him, or a hideous dereliction of duty on behalf of the prosecution resulting in a denial of the defendant's right, and a corruption of the fact-finding process.[1] The court should condemn, not condone,

---

[1] At best, the delay sanctioned by *Law*, supra, will result in hasty filing and test procedures, as seen in *Law*. Rushed proceedings could lead to errors in filing, in the chain of control, in the tests themselves, or in the interpretation of tests. In such a situation, the defendant's right of cross-examination becomes acutely important to the fact-finding process.

such behavior on the part of the state. Neither should the court attempt to distance itself from its rule of interpretation created in *Law* by passing the buck to the legislature. "Thus doubly haloed the rule becomes judicially untouchable." Traynor, "Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility," 28 Hastings L.J. 533, 540 (1977).

2. In addition, the defendant set out an additional ground for reversal in Division 1. As stated by Justice Weltner in his dissent in *Perry v. Mitchell*, 253 Ga. 593 (322 SE2d 273) (1984), there is no excuse to hold a man for two years, three months, and two days between his arrest and his trial.

No one should be proud of the way justice was administered in this case.

I am authorized to state that Justice Weltner joins in this dissent.

DECIDED MARCH 4, 1986.

*Stephen H. Harris,* for appellant.

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Staff Assistant Attorney General,* for appellee.