### A94A0348. CRUMPTON v. THE STATE.
### A94A0349. MOORE v. THE STATE.
(444 SE2d 847)

COOPER, Judge.

Defendants Christopher Crumpton and Abdjuel Javon Moore were charged jointly with the offenses of murder (Count I), possession of a firearm during the commission of a crime (Count II) and three counts of aggravated assault (Counts III, IV and V). Each defendant was also charged with possession of a firearm by a convicted felon (Counts VI and VII). Defendants were tried jointly before a jury. The trial court entered a directed verdict of acquittal as to Counts IV and V, and the jury convicted defendants of voluntary manslaughter (a lesser included offense of Count I), possession of a firearm during the commission of a crime, and the aggravated assault of Lucille Johnson (Count III). A nolle prosequi was entered as to Counts VI and VII. Both defendants now appeal their convictions and the sentences entered thereon. Because both defendants raise the same enumerations of error, their cases have been consolidated on appeal.

The evidence, viewed in a light most favorable to the jury verdict, shows that in the early morning hours of November 28, 1992, John Tillman, along with his friends James Harrell and Johnny Moore, arrived at the American Legion bar in Valdosta in a highly intoxicated state. As the three men approached the entrance to the bar, they encountered defendants and Nakea Motes leaving the bar together. A verbal confrontation erupted between the two groups and apparently Tillman fired a handgun either into the air or at a yellow Pontiac leaving the scene which was being driven by Crumpton with defendant Moore and Nakea Motes in the passenger seats.

A short time later, as Tillman drove Harrell and Johnny Moore to another bar located on Cherry Street in Valdosta, the yellow Pontiac pulled up alongside the passenger side of Tillman's vehicle. Harrell saw Crumpton pointing a gun at Tillman's vehicle and yelled "Duck!," just as Crumpton began shooting at Tillman's vehicle. Tillman was struck in the head with a bullet and died instantly at the scene.

Defendants raised two defenses at trial, arguing that Tillman's death was either the result of: (1) Harrell accidentally shooting Tillman when Tillman inadvertently bumped Harrell's arm as he drew and cocked his pistol to fire at defendants; or (2) Tillman being hit by a bullet that was fired by one of the co-defendants in self-defense in response to Harrell's pointing and/or firing a gun at defendants.

Evidence was introduced at trial that defendant Moore admitted to the police that he and Crumpton had fired their guns at Tillman's vehicle but that they did so in self-defense only after he heard the slide of a gun and Tillman telling Harrell to shoot. Several witnesses testified on defendants' behalf, supporting defendants' claim that Harrell may have had a weapon in Tillman's car at the time of the incident. However, both Harrell and Johnny Moore testified that there were no weapons present in their vehicle and that Harrell neither pointed nor fired a weapon at defendants before the shooting began.

The State's ballistic expert analyzed the bullet which had been removed from Tillman's brain but was unable to determine the type of weapon fired or caliber of bullet. A police officer testified that no casings, bullets or weapons were recovered from Tillman's car. Police officers did find seven shell casings of two different calibers outside both the driver and passenger sides of the yellow Pontiac which was parked about twenty feet away from Tillman's vehicle.

Lucille Johnson, a resident of a house located on the corner of Cherry Street, testified that she was asleep when she was awakened by loud noises, which turned out to be bullets hitting the side of her house. Once she realized the noise was gunfire, she rolled out of her bed onto the floor and called the police. One of the bullets recovered from her house was found in the headboard of a bed located in the same room where she had been sleeping.

1. Defendants first argue the trial court erred in allowing into evidence purported expert testimony from the medical examiner as to the significance of his examination of gunpowder particles found on the sleeve of the victim's shirt. During trial, Dr. Gerald Gowitt, who conducted the autopsy on John Tillman, was qualified as an expert in the field of medical technology and forensic pathology. While testifying about gunshot holes found in the right sleeve of the victim's shirt and the underlying injuries found on the right arm of the victim, Dr. Gowitt also testified that he saw microscopic gunpowder particles on the shirt worn by the victim. This testimony benefitted defendants because Dr. Gowitt's finding of gunpowder residue supported defendants' defense theory that Tillman was shot at close range by Harrell. Dr. Gowitt was then asked whether the appearance of gunpowder on the sleeve could indicate "the distance from muzzle to impact," and the witness responded in the negative. Only then did defendants object to Dr. Gowitt's testimony on the grounds that the State had laid no foundation regarding Dr. Gowitt's expertise in ballistics.

The prosecutor proceeded to elicit Dr. Gowitt's experience in this area. Dr. Gowitt testified that he had two weeks of specialized training with the State Crime Lab's chief firearms scientist and that the training included microscopic examinations of bullets, firing different

weapons at various distances on a white background in order to determine range of fire, and the examination of the signification of gunpowder presence and how it looks around a wound. He also stated that it was part of his duties as a medical examiner to examine people who had been shot and give his opinion, where possible, as to the range of fire. Dr. Gowitt also stated that he had testified as an expert in other trials in Georgia with respect to these matters. The trial court ruled that a sufficient foundation had been laid to allow the jury to consider Dr. Gowitt's testimony and that the weight of his testimony was for the jury to decide.

"To qualify an expert witness, nothing more is generally required than a showing that the witness has been educated in a particular trade or profession; such special knowledge may be derived from experience as well as study. It lies in the trial court's sound discretion to decide whether a witness has such learning or experience in a particular art, science, or profession to be treated as an expert, or to be deemed prima facie an expert; the exercise of this discretion will not be disturbed unless manifestly abused." (Citations and punctuation omitted.) *Smith v. State*, 210 Ga. App. 451, 452 (3) (436 SE2d 562) (1993). We find there was sufficient evidence to support the trial court's qualification of Dr. Gowitt as an expert to testify as to the significance of the gunpowder residue found on the victim's shirt. Thus, there was no abuse of discretion in the present case.

2. Defendants next argue that the trial court erred in denying defendants' motion for a mistrial after testimony as to scientific test results, not provided to defendants prior to trial, was ruled inadmissible. During trial, the State called Dr. James W. Howard, a qualified ballistics expert, to testify about the bullet taken from the victim's brain. When the witness later testified that he had examined the victim's shirt sleeve for gunpowder residue and had found none, both defense counsel objected to the testimony and moved for a mistrial on the grounds that the test results had not been provided to defendants prior to trial as required by OCGA § 17-7-211. The trial court ruled the test results inadmissible, denied defendants' motion for a mistrial and gave curative instructions to the jury at the request of Moore's defense counsel.

We first note that "OCGA § 17-7-211 applies to scientific reports in writing and not oral reports of experts relaying the results of tests." (Citations and punctuation omitted.) *Beck v. State*, 196 Ga. App. 269 (1) (396 SE2d 59) (1990); *Perry v. State*, 255 Ga. 490, 492 (3) (339 SE2d 922) (1986). Therefore, Dr. Howard's testimony about his examination of the victim's shirt was admissible at trial. In any event, "[t]he remedy for a violation of OCGA § 17-7-211 is the exclusion of the evidence rather than the grant of a mistrial." (Citations and punctuation omitted.) *Owens v. State*, 204 Ga. App. 5, 6 (1) (418

SE2d 631) (1992). See also *Pontoon v. State*, 177 Ga. App. 868 (2) (341 SE2d 505) (1986). Accordingly, this enumeration is without merit.

3. Defendants further argue that the trial court erred in instructing the jury on the legal theory of the parties to the crime in accordance with OCGA § 16-2-20. "Where the evidence in a criminal case shows that two or more persons were concerned in the commission of an alleged crime, it is not harmful error for the trial court to charge as to parties to a crime. . . ." (Citations and punctuation omitted.) *Holland v. State*, 205 Ga. App. 695, 696 (2) (423 SE2d 694) (1992). We find there was sufficient evidence presented in this case to support the theory that both defendants acted in concert to commit the crimes with which they were charged. Accordingly, the trial court did not err in charging the jury on the legal theory of parties to the crime. See *Todd v. State*, 184 Ga. App. 750 (3) (362 SE2d 400) (1987).

4. Defendants argue the trial court erred in not initially charging the jury on the law of transferred intent as it applies to the defense of justification. Defendants requested a charge on this theory because self-defense was one of defendants' major defense theories in this case. Both defendants claimed they shot at Tillman's vehicle only after Harrell pointed or fired a gun at them. Thus, if defendants had been justified in protecting themselves against Harrell, they could not be guilty of the crimes with which they were charged against Tillman and Lucille Johnson. The trial court initially refused defendants' request to charge on transferred intent. However, after the jury sent two notes indicating they were confused about the issue of transferred intent, the trial court decided to charge the jury on this legal theory using a similar charge to the one requested by defendants. Approximately one hour after hearing the charge, the jury returned guilty verdicts against both defendants.

Defendants argue they were unfairly prejudiced by the trial court's delay in charging on transferred intent. However, we see no way that defendants were harmed by the trial court's initial refusal to charge on this theory. The jury ultimately considered defendants' defense theory of self-defense/justification and rejected it after a little over an hour of deliberation. Therefore, contrary to defendants' claim that an earlier charge on transferred intent may have yielded a different verdict, the facts suggest that an earlier charge would probably have resulted in an earlier conviction. Thus, this enumeration is without merit.

5. In their last four enumerations of error, defendants attack the sufficiency of the evidence raising the general grounds. After a careful review of the transcript in this case, we find that a rational trier of fact could have found the defendants guilty beyond a reasonable doubt of the offenses of voluntary manslaughter, possession of a fire-

arm during a crime, and the aggravated assault of Lucille Johnson. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. Birdsong, P. J., and Blackburn, J., concur.*

Decided May 27, 1994.

*James W. Hall, Jr.*, for Crumpton.
*J. Michael Mullis*, for Moore.
*H. Lamar Cole, District Attorney, Bradfield M. Shealy, Assistant District Attorney*, for appellee.